## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA and the<br><br>STATE OF CALIFORNIA,<br>STATE OF COLORADO,<br>STATE OF CONNECTICUT,<br>STATE OF DELAWARE,<br>DISTRICT OF COLUMBIA<br>STATE OF FLORIDA,<br>STATE OF GEORGIA,<br>STATE OF HAWAII,<br>STATE OF ILLINOIS,<br>STATE OF INDIANA,<br>STATE OF IOWA<br>STATE OF LOUISIANA,<br>STATE OF MARYLAND<br>COMMONWEALTH OF MASSACHUSETTS,<br>STATE OF MICHIGAN,<br>STATE OF MINNESOTA<br>STATE OF MONTANA,<br>STATE OF NEVADA,<br>STATE OF NEW HAMPSHIRE,<br>STATE OF NEW JERSEY,<br>STATE OF NEW MEXICO,<br>STATE OF NEW YORK,<br>STATE OF NORTH CAROLINA<br>STATE OF OKLAHOMA,<br>STATE OF RHODE ISLAND,<br>STATE OF TENNESSEE,<br>STATE OF TEXAS,<br>COMMONWEALTH OF VIRGINIA,<br>STATE OF WASHINGTON and,<br>STATE OF WISCONSIN<br><br>*ex rel.* **BROOKE HALLAM**<br>    **Plaintiff-Relator,**<br>              v.<br>**EV3 ENDOVASCULAR, INC. (d/b/a EV3 INC.), TYCO HEALTHCARE GROUP LP (d/b/a COVIDIEN); and COVIDIEN, PLC,**<br>    **Defendants.** | **1:14-cv-08331**<br>**Judge Ruben Castillo**<br>**Magistrate Judge Daniel G. Martin**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMAND**<br><br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)(2)**<br><br><br><br>**FILED**<br><br>OCT 2 3 20.4<br><br>**THOMAS G BRUTON**<br>**CLERK, U S DISTRICT COURT** |

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

Plaintiff and Relator Brooke Hallam ("Relator"), by and through her attorneys, brings this

Complaint on behalf of the United States under 31 U.S.C. § 3730 and on behalf of the following

states, alleging violations of their state law counterpart:

- California (False Claims Act, Cal. Gov't Code § 12650 *et seq.*)
- Colorado (Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 *et seq.*)
- Connecticut (Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301 *et seq.*)
- District of Columbia (District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.*)
- Delaware (Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.*)
- Florida (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)
- Georgia (State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*)
- Hawaii (Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)
- Illinois (Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*)
- Indiana (False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)
- Iowa (Iowa False Claims Act, Iowa Code § 685.1 *et seq.*)
- Louisiana (Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*)
- Maryland (Maryland False Health Claims Act, Md. Code Health-Gen. § 2-601 *et seq.*)
- Massachusetts (Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5 *et seq.*)
- Michigan (The Medicaid False Claim Act, Mich. Comp. Laws § 400.601 *et seq.*)
- Minnesota (Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*)
- Montana (Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*)
- Nevada (Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.010 *et seq.*)
- New Hampshire (Medicaid Fraud and False Claims, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*)
- New Jersey (New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*)
- New Mexico (Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.* and Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)
- New York (New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)
- North Carolina (North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*)
- Oklahoma (Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.*)
- Rhode Island (State False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)
- Tennessee (Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.* and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)
- Texas (Medicaid Fraud Prevention, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*)

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

- Virginia (Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)
- Washington (Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.010 *et seq.*)
- Wisconsin (Wisconsin False Claims Act, Wis. Stat. § 20.931 *et seq.*)

(collectively "FCA States"). Based on personal knowledge, unless otherwise indicated, and relevant documents, relator alleges the following:

## I.   INTRODUCTION

1.      This is an action for damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, and its state counterparts. This case involves kickbacks to physicians by ev3 Endovascular, Inc. (d/b/a ev3 Inc.), Tyco Healthcare Group LP (d/b/a Covidien), and Covidien, PLC (jointly "Defendants" or "Covidien") to induce them to use its SilverHawk™ and TurboHawk™ Placque Excision Systems to treat Peripheral Arterial Disease, a diagnosis experienced mainly by older patients covered by Medicare.

2.      The kickbacks took the form of payments to doctors from Defendants' Physician Education Department for claimed personal services. The payments did not fall within the safe harbor of the Anti-Kickback statutes. They were driven by the marketing department and had the purpose of inducing physicians to maintain and increase their use of the SilverHawk and TurboHawk Plaque Excision Systems (together "Products," or "Plaque Excision Products"). To this end, and among other things, payments were made under faulty and *ad hoc* contracts, for training sessions that were not needed, and as workarounds to satisfy physician demands for compensation that were not otherwise legally justified. These kickbacks resulted in the submission of false claims to the government for the purchase of Defendants' Plaque Excision Products under programs such as Medicare and Medicaid.

3.      Long before "Orange is the New Black" became popular, Relator Brooke Hallam, who worked in Physician Education, expressed her concerns about this illegal conduct. She told

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

the Director of Physician Education, Don Grant, "I don't look good in orange." Grant did not

deny the illegalities, but instead told her not to worry. He assured her that she would not be the

one to take the fall—it would be higher management. Relator was told to do whatever was

needed to retain physicians as customers, particularly the high users of the products, called

"Hawkers." She routinely pushed back, challenged, and refused to make payments that she could

not justify, and expressed her belief that the conduct violated the law. This persistence ultimately

cost Relator her job.

## II.    JURISDICTION AND VENUE

4.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1331

and 31 U.S.C. § 3732. The Court also has original jurisdiction over the State law claims

pursuant to 31 U.S.C. § 3732(b) because this action is brought under state laws for the recovery

of funds paid by the FCA States, and arises from the same transaction or occurrence brought on

behalf of the United States under 31 U.S.C. § 3730. Finally, the Court has supplemental

jurisdiction over the state law retaliation and wrongful discharge claims pursuant to 28 U.S.C. §

1367.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. §

3732(a), because Defendants can be found and do business in this District. In addition,

Defendants have committed acts proscribed by 31 U.S.C. § 3729 in this District.

6.    Relator is aware of no statutorily relevant public disclosure of the allegations or

transactions in this Complaint. Even if such a disclosure had occurred, relator is an "original

source" of the allegations in this Complaint and meets the requirements of 31 U.S.C. §

3730(e)(4)(B). During her four years at Defendants, relator acquired direct and independent

knowledge of the information on which the allegations in this Complaint are based and she

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

voluntarily and in good faith provided this information to the government before filing this action.

7.      As required by 31 U.S.C. § 3730(b)(2), relator served the United States with a written Disclosure Statement providing all material evidence and information she possesses that support the allegations in this complaint and has met corresponding requirements of the FCA States.

### III.    PARTIES

#### A. Plaintiffs

8.      The United States of America is the plaintiff on whose behalf the Relator Brooke Hallam brings this action under 31 U.S.C. § 3729 *et seq*. The United States acts through its various agencies and departments, including the Department of Health and Human Services ("HHS"), the Veteran's Administration ("VA") and other relevant government payers.

9.      The FCA States are also plaintiffs on whose behalf the Relator brings this action under their state law counterparts to the FCA.

10.     Relator Brooke Hallam is a citizen of the United States, and a resident of the state of Minnesota. With a background in graphic design, accounting, business, and emergency health care services, she began working for ev3 in January of 2008 as a Training Operations Coordinator. She then was promoted to positions involving physician education. Her title was Associate Physician Education Specialist when she was terminated in November of 2011 in retaliation for reporting, objecting to, and refusing to participate in illegal kickback activities in her business. After her termination, Relator continued to work in medical sales for about two years. She is now engaged in other kinds of sales.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

### B. Defendants

11.     Defendant ev3 Endovascular, Inc. (d/b/a ev3 Inc.) is a technology provider for specialists treating a wide range of vascular diseases and disorders. The corporate headquarters of ev3 Inc. are located in Plymouth, MN at 3033 Campus Drive. Ev3 Inc. was acquired by Covidien, PLC on July 12, 2010.

12.     Defendant Covidien, PLC, is a global manufacturer of medical devices and supplies, with over 38,000 employees worldwide. Its principal executive office is located in Dublin, Ireland and its United States headquarters is located in Mansfield, Massachusetts. Covidien, PLC acquired ev3 Inc. on July 12, 2010 for $2.6 billion. A publicly held company, Covidien, PLC reported revenue of $10.2 billion in 2013. About half of that amount was derived from sales in the United States.

13.     Defendant Tyco Healthcare Group, LP (d/b/a Covidien) is the entity that employed Plaintiff after ev3 Inc. was acquired by Covidien, PLC.

14.     Together, ev3 Endovascular Inc., Covidien, PLC and Tyco Healthcare Group LP (d/b/a Covidien) are referenced in this Complaint as "Defendants" or "Covidien."

### IV.    STATUTORY AND REGULATORY CONTEXT

15.     Defendants' products were purchased on behalf of government-pay patients admitted to healthcare facilities for peripheral atherectomy procedures throughout the country. Defendants induced physicians to use their medical devices for these procedures by paying them illegal kickbacks. These kickbacks tainted the billing of the government for purchases of the medical devices resulting in the submission of false claims in violation of the False Claims Act. Defendants thereby submitted and caused the submission to the government of false claims for these products in violation of federal and state False Claims Acts.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

### A.    The Anti-Kickback Statute

16.    The Medicare and Medicaid Patient Protection Act of 1987, also known as the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), prohibits kickbacks in any "Federal health care program," defined as any program providing health benefits that is funded directly, in whole or in part by the United States Government, and any "State health care program." 42 U.S.C. § 1320a-7b(b)(2)(A) and (f).   State health care programs include those approved under 42 U.S.C. §§ 1396 *et seq.* and child health plans approved under 42 U.S.C. §§ 1397aa *et seq.*   They also include any programs receiving funds under or from an allotment to a State under 42 U.S.C. §§ 701 *et seq.* or 42 U.S.C. §§ 1396 *et seq.*

17.    The AKS applies to all federal health care programs, except the FEHBP.[1] These include, among others, Medicare, Medicaid, TRICARE, Indian Health Services, and the Veterans Health Administration. All of these government-pay health care programs require every provider or supplier to ensure compliance with federal laws governing their services, including the AKS.

18.    Violation of the AKS can result in the imposition of criminal penalties.  42 U.S.C. § 1320a-7b(b)(2).

19.    The purpose of the AKS is to ensure that patient care is not compromised by improper influence from the health care industry. "The Federal anti-kickback law's main purpose is to protect patients and the federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions." OIG Fact Sheet, November 1999.[2]

20.    Under the AKS it is illegal (a felony) to knowingly and willfully offer or pay "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly,

---

[1] Federal Employee Health Benefits Plan.
[2] http://oig.hhs.gov/fraud/docs/safeharborregulations/safefs.htm.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

in cash or in kind to any person" to induce that person "to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

21.     Accordingly, the AKS prohibits a medical device manufacturer and supplier from giving any type of compensation in cash or kind to a physician when a purpose of the compensation is to influence the physician to use its product or to use its product instead of the product of a competitor. Because the harm from kickbacks is sometimes difficult to detect, kickbacks are illegal regardless of the impact of a particular kickback on quality of care.

22.     The types of compensation that typically violate the AKS include paying physicians money for sham or overpriced consulting services or bogus research and educational grants, and plying them with lavish travel, food and lodging in the guise of educational programs.

23.     The AKS provides certain "safe harbors" that allow medical providers to compensate physicians for activities that meet particular requirements. 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952.

24.     One safe harbor allows a manufacturer or distributor to compensate a physician for personal services "as long as all of the following seven standards are met—

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of

the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services."

42 C.F.R. § 1001.952(d).

25.     Strict compliance with the "safe harbor" mandates is required and regardless of the appearance of compliance, a kickback occurs if one purpose of the conduct is to induce sales. In a recent guidance, the Office of the Inspector General of the Department of Health and Human Services, which is responsible for investigating fraud related to department programs, including kickbacks, and evaluating the legitimacy of claimed safe harbors, stated that kickbacks may be found if "any *one* purpose of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program." 68 Fed. Reg. 23734 (emphasis in original).

26.     Covidien fails to meet "safe harbor" requirements, among other things, because it uses its physician education program to offer and pay money to physicians to induce them to utilize Plaque Excision Products. Covidien also pays compensation based on the volume of

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

business that physicians generate, violates the fair market value and arms-length negotiation requirements for personal services arrangements, and uses the physicians' services to meet sales goals rather than achieve commercially reasonable business purposes.

### B.     The False Claims Act

27.     The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, provides that:

(a)     (1) . . . any person who

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

is liable to the United States Government. . . .

(b)     For purposes of this section—(1)the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information--

(i)  has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information, and

(B) require no proof of specific intent to defraud; . . .

31 U.S.C. § 3729(a)(1)(A), (b) (FCA as amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21). The FCA States have essentially the same provisions in their state counterparts to the FCA.

28.     The FCA also prohibits retaliation against an employee because of lawful acts done by the employee "in furtherance of an action under this section or other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h). The Minnesota False Claims Act, Minn. Stat. § 15C.145, contains the same prohibition against retaliation.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

### C.     Reimbursement by Government-Funded Health Care Programs

29.     Medicare, which provides health insurance for aged and disabled individuals, is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Studies ("CMS"). Medicare Part A authorizes payments from federal funds for hospitalization and post-hospitalization care. Medicare Part B similarly pays for medical and other health services, including physician services, certain pharmaceutical products, diagnostic tests, and other medical services not covered by Part A.

30.     Medicaid, jointly funded and administered by the federal and state governments, involves payments by the states directly to providers, with reimbursement from the United States Treasury, to provide medical assistance to individuals including persons who are low-income, blind, or disabled.

31.     Other government-funded health care programs also pay for medical devices like those at issue in this case. These include the State Children's Health Insurance Program (SCHIP), Indian Health Service, TRICARE, and the Veterans Health Administration (VHA) (together, "government health care programs").

### D.     Healthcare Providers Must Certify Compliance with the AKS

32.     Physicians and health care providers must expressly certify compliance with applicable laws through means such as provider agreements required by Medicare and signed by physicians and other providers, including hospitals and ambulatory surgical centers, certifying that they will comply with applicable laws including the AKS (*e.g.*, Forms CMS 855A, 855B, and 855I). The certification includes an acknowledgement that compliance is a condition for receipt of payments from the government.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

33.     Similarly, before reimbursement can occur, the Medicaid and SCHIP programs require states to submit forms, including Forms CMS 37 and 64, that include a certification that the expenditures for which payment is sought are allowable under applicable laws and regulations.

34.     Hospitals and other health care facilities also submit regular cost reports (*e.g.*, Form CMS 2552-10) to the government that certify as a condition of payment that the provider has not accepted financial inducements in violation of applicable statutes.  State health care programs require similar certifications that the providers have complied with applicable laws to be eligible for payment.

35.     Accordingly, either pursuant to provider agreements, claim forms or other means, hospitals, other health care facilities and physicians who participate in a federal or state health care program generally must certify that they have complied with the applicable federal rules and regulations, including the AKS.

### E.     False Statements of Compliance Violate the FCA

36.     If, in order to get paid, a health care provider falsely certifies that it is in compliance with the AKS, that false statement violates the FCA.

37.     The Patient Protection and Affordable Care Act ("PPACA"), specifically links violations of the AKS to the FCA. It amended the AKS to provide that "items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Public Law No. 111-148, § 6402(g).

38.     The PPACA also amended the intent requirement to clarify that, just as with violations of the FCA, violations of the federal anti-kickback provisions may occur even if an

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

individual "does not have actual knowledge" or "specific intent to commit a violation." *Id.* at §

6402(h).

## V.   FACTUAL ALLEGATIONS

### A.   Defendants Sell SilverHawk and TurboHawk Products to Treat Peripheral Arterial Disease

39.   Covidien's Medical Device segment includes its Peripheral Vascular business,

which offers, among other things, endoarterial[3] products to treat peripheral arterial disease

("PAD").

40.   PAD is a circulatory problem in which narrowed arteries reduce blood flow to an

individual's limbs. PAD is often a sign of atherosclerosis, in which fatty deposits (plaque)

accumulate in the arteries causing reduced blood flow.[4]



---

[3]"Endoarterial" is defined as "of or relating to the intima of an artery." http://www.merriam-webster.com/medical/endarterial. The "intima" is "the innermost coat of an organ (as a blood vessel) consisting usually of an endothelial layer backed by connective tissue and elastic tissue—called also *tunica intima*." http://www.merriam-webster.com/medical/intima.

[4] http://www.mayoclinic.org/diseases-conditions/peripheral-artery-disease/basics/definition/CON-20028731. Image is from http://www.cdc.gov/dhdsp/data_statistics/fact_sheets/fs_pad.htm.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

41.     PAD "is a large and ever-growing problem as the population ages and people live longer. It is a progressive and incurable disease that currently affects eight to 12 million people in the United States."[5]

42.     As indicated in the graph below, PAD typically impacts older individuals and the CDC lists "Older than age 60" as a risk factor for PAD.[6]



43.     Besides age, the CDC lists smoking, high blood pressure, atherosclerosis, diabetes and high cholesterol as risk factors for PAD.[8] In its brochure on PAD, Defendants additionally identify as risk factors, a history of vascular disease, heart attack or stroke, and being African American or Hispanic (noting that some minority groups are more than twice as likely to have PAD).[9]

---

[5] Covidien Peripheral Vascular U.S. Product Catalog 2013, p. 2.
[6] http://www.cdc.gov/dhdsp/data_statistics/fact_sheets/fs_pad.htm.
[7] *Id.*
[8] *Id.*
[9] http://www.ev3.net/assets/006/5728.pdf.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

44.     Defendants' endoarterial products to treat PAD include Directional Atherectomy Systems, also called Plaque Excision Systems, designed to remove plaque from within the blood vessels of the arteries in the leg and foot.[10]

45.     Ev3, now through Covidien, sells two of these systems to treat PAD, the SilverHawk™ and the TurboHawk™ Plaque Excision Systems (together "the Systems," or "the Plaque Excision Systems"). These Systems allow for minimally invasive treatment of PAD by insertion of a catheter into the artery. The catheter contains a carbide blade that cuts through the plaque and collects the tissue in a nosecone, which can then be retracted from the body. These Systems permanently remove the plaque, thereby increasing blood flow in the arteries. The difference between the two is that the SilverHawk has one inner blade and is intended to treat atherosclerosis (collections of plaque in the artery), while the TurboHawk has four blades, and is used for moderate to more severely calcified lesions.[11]

---

[10] An atherectomy is the "removal of atheromatous [fatty] plaque from within a blood vessel by utilizing a catheter usually fitted with a cutting blade or grinding burr." http://www.merriam-webster.com/medical/atherectomy.

[11] An animation of the SilverHawk device is found at http://www.ev3.net/peripheral/us/plaque-excision/silverhawk-plaque-excision-system-with-proprietary-mec-technology.htm. A similar presentation for the TurboHawk device is found at http://www.ev3.net/assets/007/5784.wmv.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)



**Figure 1A. The TurboHawk plaque excision system (Covidien).** *Image courtesy of Covidien.*

46.     Procedures using the SilverHawk or TurboHawk are typically performed in hospitals or ambulatory surgical centers. The Systems are purchased individually to be used for a single procedure and are available in different sizes and lengths depending on the size of the blood vessel and lesion being treated.[12]

47.     The U.S. revenue for Defendants' "plaque excision franchise" was reported on September 1, 2011 as follows:

| | |
|---|---|
| 2008 | $86.4M |
| 2009 | $73.9M |
| 2010 | $83.7M |
| 2011 | >$100M (with one month remaining in fiscal year)[13] |

48.     On September 30, 2011, Defendants reported sales of $1.5M for a single day.

---

[12] *See* Covidien Peripheral Vascular U.S. Product Catalog 2013, Sec. 2.0, pp. 9-11.
[13] Defendant's fiscal year goes from October 1 through September 30 of the following year.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

49.     In its 2013 Annual Report, Covidien reported total sales for that year of $10.2 billion, about half of which ($5.2 billion) occurred in the United States. Medical devices represent about 83% of the total sales.[14]

50.     Covidien's primary competitor for sale of plaque excision devices is Cardiovascular Systems, Inc. or CSI, which sells the Diamondback and Predator systems for treatment of PAD.

### B. The Government Is Routinely Billed and Pays for SilverHawk and TurboHawk Products

51.     The 2013 Covidien Annual Report, states that its medical devices "are used primarily by hospitals and ambulatory care centers," and that it markets its medical devices through its direct sales force and third-party distributors "primarily to physicians, nurses, materials managers, group purchase organizations (GPOs) and governmental healthcare authorities."[15]

52.     Because of the prevalence of PAD in older citizens, Medicare and Medicaid are substantial payers for SilverHawk and TurboHawk products.[16]

53.     The Veteran's Administration is also a direct purchaser of SilverHawk and TurboHawk products. A search on www.usaspending.gov using ev3's DUNS number and the

---

[14] http://www.covidien.com/investor/phoenix.zhtml?c=207592&p=irol-reportsannual.

[15] http://www.covidien.com/investor/phoenix.zhtml?c=207592&p=irol-reportsannual at 2.

[16] Data from the U.S. Department of Health and Human Services showed that in 2011 the population aged 65 or older, almost 93% of the population had Medicare coverage, 9% had military-based health insurance, 9% of the non-institutionalized elderly were covered by Medicaid among Medicare beneficiaries residing in nursing homes, 49% were covered by Medicaid. http://www.aoa.gov/Aging_Statistics/Profile/2012/docs/2012profile.pdf at 14. A 2008 article titled "National health care costs of peripheral arterial disease in the Medicare population" by Alan T Hirsch, Lacey Hartman, Robert J Town and Beth A.Virnig in Vascular Medicine estimated that the annual cost of to Medicare for PAD was $3.9 billion for in-patient and out-patient treatment. http://vmj.sagepub.com/content/13/3/209.full.pdf.

advance, paying fair market value compensation, and ensuring that the consulting arrangements "are intended to fulfill a legitimate business need and do not constitute an unlawful inducement." To this end, the company must also

   i. Not allow company sales personnel to control or unduly influence the decision to engage a particular Health Care Professional as a consultant; sales personnel should only provide input "about the suitability of a proposed consultant";

   ii. Select consultants based on "qualifications and expertise to meet the defined need";

   iii. Compensate consultants consistent with fair market value, not on the basis of volume or value of consultant's "past, present or anticipated business."

57.    The AdvaMed Code also instructs that company-conducted education should occur in settings "conducive to the effective transmission of information and may provide "modest" food and lodging, as well as reasonable travel.

58.    Consistent with and reflecting an understanding of its adopted Code of Ethics, Covidien stated in a fall 2011 presentation that physician education should "explain the safe and effective use of Covidien products to persons who have a *bona fide* need for such training and education."

### D.    Defendants' Physician Education Function Was Embedded in Marketing and Sales

59.    Beginning in July of 2008, Relator worked in what will be called in this Complaint the "Physician Education Department" for Defendant's Peripheral Vascular business. Hired in July of 2008 as a Customer Education and Sales Training Coordinator, she assisted in the planning and execution of physician education courses. She first reported to Bradley Ford, the Customer Education and Sales Training Director. Laurel Fowler became her supervisor in October, 2008. Relator's job was first positioned in the Marketing Development Department. Effective January 1, 2009, her position was relocated to the Marketing Department.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

60.     Also in January of 2009, Don Grant became the Director of Professional Education for the Peripheral Vascular business. In that position, he had dual sales/education roles because he was responsible for the Sales Training and Physician Education Departments, as well as the National Sales Meeting. He has a B.A. degree in marketing, and had previously worked in positions involving sales, including as a Territory and then Regional Manager for ev3. When he took on the position, he had no experience in physician education.

61.     In August of 2009, Hallam was promoted to the position Associate Physician Education Specialist.[21] In that role, her responsibilities included hands-on programming for Centers of Excellence, programming for physician Fellows, managing regional proctorships, and managing training contracts for physicians.

62.     The month after Covidien purchased ev3, Macaire Merkel became Relator's supervisor. Her title was Manager, Physician Education, and she reported directly to Don Grant. From then until Relator left the company, the Physician Education Department consisted of the Director, Don Grant, Macaire Merkel, and three physician education specialists, including Relator, plus an administrative assistant.

63.     The Physician Education Department in the Peripheral Vascular business serviced physicians who purchased the Plaque Excision Products throughout the United States.

64.     The persons responsible for physician education attended the national sales meeting, as well as marketing meetings. They also received sales communications (email) as part of "PV sales." Don Grant routinely received the "Today's Sales" report sent to the Regional Managers.

---

[21] Relator's final paycheck listed her position as "Clinical Educator."

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

65.     By virtue of her position within the Physician Education Department, Relator personally observed Defendants' practices related to physician education and sales across the United States and was privy to meetings, conversations, email and other internal communications, including communications and documents circulated among upper management.

66.     In a September 2011 PowerPoint related to planning physician education programs for the 2012 fiscal year, Covidien confirmed that physician education was embedded with Peripheral Vascular marketing when it stated "PACE sits with the business."

### E.     Planning for the Physician Education Department Was Driven by Sales Goals

67.     The Peripheral Vascular sales force was led by Area Vice Presidents ("AVPs") who reported to a Vice President of Sales and Marketing. The sales force was divided into geographical divisions headed by "AVPs." The divisions were further broken down into regions and then territories, led by Regional Managers ("RMs") and Territory Managers ("TMs"), who were assisted by Hawk Specialists ("HSs"). Relator estimates there were about 150 employees in the sales force at the time she left the company.

68.     Relator's concerns about illegal conduct related to physician education and sales of ev3 products began when Don Grant became Director. When ev3 became a part of Covidien, the physician education function was placed under what was called PACE ("Physician Affairs and Clinical Education"). However, Don Grant also had at least dotted line reporting responsibility to the AVPs of Sales and it was clear to Relator that his allegiance was to sales. Director Grant met frequently with the AVPS; their joint desires and preferences related to sales had a controlling influence on physician education programming.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

69.     There was no particular training required for physicians to perform peripheral atherectomy procedures using the SilverHawk or TurboHawk Systems. Nor did those Systems involve the type of medical technology that requires technical support from the manufacturer when it is being used, although TMs on occasion stood in on procedures to provide technical support to physicians for utilization of the devices.

70.     During the time that Relator worked under Grant as Director of Physician Education, the company offered varying types of educational programs—including peer-to-peer meetings, skill development and staff training—each designed to maintain and increase usage of SilverHawk and TurboHawk Products by those who participated in the programs.

### 1.     Peer-to-Peer Meetings: Hawk Series and Region Summits

71.     Grant claimed that Covidien's peer-to-peer meetings were "designed to encourage group interaction and education." The targets for those meetings were physicians with at least minimal experience with the Products, and the presenters were typically high users, characterized as "Hawkers" or "Thought Leaders." Defendants paid the presenters for their services at these meetings and further paid the expenses for all participants.

72.     The Hawk Series of meetings were weekend conferences. The conference included large group sessions with speakers and panels and small break-out sessions. The Hawk meetings typically involved about one hundred physicians.

73.     For speakers, Director Grant focused the physician education team on selecting, and thereby compensating, Hawkers/Thought Leaders and those deemed by sales to have potential to achieve that status, to ensure their ongoing interest in and support of the company's Plaque Excision Products. The participants in the Hawk meetings were selected and invited by the TMS and RMs, enabling them to use the invitations to target physicians for sales purposes.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

74.     The Region Summits typically involved an overnight and a full day, for about twenty-five physicians within a particular sales region. The Summits also involved large group presentations and sometimes cadaver lab training sessions.

75.     As with the Hawk series, the physician speaker slots were used to motivate physicians to maintain and increase their utilization of the Products. Instead of allowing his team to plan the programs, Director Grant sent email to Regional Managers asking them to nominate who should be paid to teach in their region. Relator was then directed to use the nominees even if there were no particular qualifications warranting the selection. The participants were also selected and invited by the sales force, again allowing them to use the invitations to drive sales goals.

76.     The Hawk and Region Summits were held at luxury hotels and resorts, including, for example, the Royal Palms Resort and Spa in Phoenix, the Hotel Monteleone in New Orleans, The Lodge at Torrey Pines in LaJolla, and the Sutton Place Hotel in Chicago.

### 2.     Skill Development Offerings

77.     Also included in physician education were Hands-On Courses and Observational Training, which fall into the category of skill development.

78.     The Hands-On Courses were generally taught by physicians labeled as "Centers of Excellence" faculty, who were paid by Defendants to execute a one- or two-day program working directly with another physician who actually participated in the procedures performed. The payment to the faculty for these sessions was typically $3,000 per day.[22]

---

[22] Of course, in both these and the observational courses, the physician was also being paid for performing the procedure itself.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

79.     For Observational Training one or two physicians observed a physician perform procedures using the Products. The trainer for this offering typically received $1,500 for the course.

80.     For both hands-on and observational training, Defendants paid the travel and hotel costs for the physician receiving the training.

81.     Again, the sales force had a significant role to play in identifying Centers of Excellence faculty and those encouraged and invited to participate in the skill development offerings.

82.     In fact, sales regions had their own funds that could be allocated to observational training and stipends for speaking, giving them even more ability to use physician education money for sales purposes and to control decisions to engage particular physicians as consultants based on sales goals. As discussed below, this independence and control resulted in *ad hoc* contracting situations that further violated any safe harbor that could be claimed for this conduct.

### 3.      Staff Training

83.     Defendants' most blatant use of compensation to induce sales occurred in the context of staff training. This initiative came from Director Grant and the AVPs, not from the physician education staff.

84.     When Don Grant began as Director of Physician Education in early 2009, sales of the Products were down.[23]

85.     As one of his first initiatives, Don Grant created staff training programs. The first was called the TM ("Territory Manager") Certificate Program. In this two-day program, Defendants paid physicians to train the Defendants' staff in use of the Products. While the

---

[23] In mid-2007, ev3 had merged with Fox Hollow Technologies, the company that developed the SilverHawk, but did not retain the Fox Hollow sales force, resulting in a drop in sales.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Statements of Work ("SOW") for the physician trainers generally described the same tasks for the two-day training sessions, the amount paid to the physicians varied, from $750 per participant for a maximum of $3,000 for the two-day session, to $1,500 per participant for a maximum of $6,000. Some physicians contracted for one-day sessions.

86.     The staff who were supposedly being trained by the physicians had already been trained on the Products as part of their initial two-week sales training course, and Covidien also had videotapes of live procedures that could be used for training.

87.     However, because Covidien created a claimed "need" for certifying in excess of 100 TMs and HSs, the sales force could target many more physicians to compensate for these "training" sessions and many more physicians were placed on personal service contracts.

88.     The proposed trainer physicians were recommended by the sales force, again as an opportunity to target sales growth. In fact, a listing of training sites for the TM Certificate program stated "Opportunity for increased SH usage" as the first of the "Points to consider for recommendation."

89.     Before Director Grant began, Relator had a list of doctors who were used for educational offerings. She knew who they were and that they were qualified for the consulting work for which they were being paid. When the certification program was begun, she expressed concerns to the Director that no criteria other than sales goals were being used for the selection of physicians and sites. She explained that they had a responsibility to select consultants based on their qualifications to meet the need, but her concerns fell on deaf ears. She was directed to use physicians based on recommendations from TMs and RMs, without any direct knowledge of their ability to execute the training well.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

90.     Once the training sessions began, if a scheduled training class was not filled to capacity to allow for maximum payment to a physician, Relator was instructed to fill the slots by using any warm body, even if it meant sending the same sales representatives to multiple trainings.  Marketing and other non-sales personnel were also used to fill training classes. One TM Training List for Quarter 1 in 2010, includes, for example, one attendee (SG) attending sessions taught by three different physicians, and two others (CJ and SL) each attending two different sessions. This showed that the staff training was not being used for a bona fide purpose, but instead to pay physicians as motivation for them to use the Products even more and thereby increase sales.

91.     It is not surprising that that the attendees routinely received percentage scores in the high 90s on their certification "tests."  They had previously been trained.

92.     Later in 2009, when the TurboHawk system was introduced, a similar certification program was inaugurated for that Product. That was followed by BTK (below the knee) training. These trainings allowed Covidien to continue to pay many physicians as a motivation to increase their use of the Products. Again, the attendees for these training cycles included repeat sales personnel and others, such as engineers and marketing staff, who did not need the training.

93.     At some point, given the number of contracts that had been executed, Relator did a needs assessment for the observational training and concluded that the need was low and there were more physicians contracted than were needed. Relator discussed this with Director Grant and he said this didn't matter. He told her he was using the contracts to induce low users to increase their use, and they would fill the training slots however they could.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

### F.   Other Indicators Showed that Sales Goals Unduly Influenced Physician Education

94.   Besides the specific programming decisions discussed above, other indicators showed that a sales goal culture was cultivated at Covidien that dominated the Physician Education Department and limited its ability to function independently with respect to how physicians were compensated.

#### 1.   The Success of Physician Education Was Based on Subsequent Sales

95.   Defendants measured the "effectiveness" of the Region Summit and Hawk Series physician education programs by the resulting utilization of the Products, which of course meant sales. After an event was completed, Relator was directed to track the subsequent use of the Products by the attendees after 4, 8, 12, 16, 26, and 52 weeks following the event. Then graphs were prepared comparing the attendees' average prior vs. post Plaque Excision utilization over the 52 week period following the event.  In the period from 2009 through 2011, the data showed that participation in both programs increased utilization, and therefore sales.

96.   A Physician Education Utilization spreadsheet from November of 2010 compares the number of physicians used in physician education programs within the region to the "Total Sales % to Plan." A similar comparison is used for "Total Education Events."

97.   Email to the sales team about their successes name Physician Education as a contributor to those sales successes. Another email talks about "filling up our training programs like our Summit meetings" as a reason for a successful increase in sales numbers.

#### 2.   The Physicians "Belonged" to the Sales Force

98.   The PV sales force identified physicians in their territories according to their usage of the Plaque Excision Products. Physicians were identified as "Hawkers" if their usage

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

exceeded a certain number of Plaque Excision Products a month.  Physicians were otherwise characterized as a "target," "not-target," "new," "dabbler," and "defector." It was common for Defendants to include the physicians' sales identifier in lists relating to physician education.

99.    The PV sales force and Physician Education Department also closely identified their physician customers with their specific TMs and their Regions. One email identified a physician as "Jim Haynie's doctor," as if the TM were an "owner" or "handler" of the physician. Don Grant also specifically asked the physician educators to include the TM connected to the physician when providing data to him about attendees at physician education events.

100.    Communications related to specific physician education events often included TMs and RMs as well as the members of the Physician Education Department. This includes scheduling dates for education offerings and troubleshooting if there were problems with scheduling or payment.

101.    Communications among the sales and physician education personnel make it clear that the Physician Education Department had walking orders to give special and very careful treatment to high user physicians in particular (e.g. "Hawkers"). For example, one Hawker was referenced as "the esteemed Dr. —;" and "this important customer," and when a payment to that Hawker had been missed, Merkel offered to communicate an explanation "accompanied by plenty of groveling, apologizing and promising to personally manage the payments going forward."

102.    Since communications with the physicians often had to go through the TMs, the physician educators were hampered in developing independent relationships with the physicians for whom they provided programming.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

103.   The sales regions had funding they could and did use for education events focused on physicians in their regions. This, too, created more courses than were needed and made it more difficult for the physician education team to fill up previously planned offerings.

104.   Another result of regional funding was the solo planning of physician education events by sales personnel without involving the Physician Education Team. This happened for example in 2011, when a TM notified Relator on a Tuesday that Dr. McKinsey was doing an observational training day on Thursday of that same week and asked whether an SOW was needed before the training.

105.   In the fall of 2011, Don Grant told sales personnel that funding for such events would now come from PACE. In that same communication, though, Grant indicated "we have worked the budget through the AVPs," implying the continued intermingling of education and sales funds.

### 3.   Covidien Only Paid Lip Service to Consultant Contracts and Used Them to Induce Sales

106.   During Relator's tenure with Defendants, they made some efforts to have signed "Independent Consultant Agreements" ("Agreement") with physicians who were being paid to provide services to the company. The Agreement, for a year's term, acknowledged the AKS and states that it is intended to comply with the statute's "safe harbor" for personal services. However, Defendants were only paying lip service to the safe harbor's contract requirements.

107.   The Agreement itself does not articulate the work to be performed or the compensation, which is claimed in the Agreement to represent fair market value. The Agreement states that the Company is retaining the Physician "to serve as a technical consultant and to perform certain consulting services, which may include, but may not be limited to, the Services outlined in the attached Statement(s) of Work . . ." ("SOW").

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

108.    The SOWs identify particular types of work that the Physician will do, such as "hands-on training of physician," or "hosting observational training sessions," and they state the compensation to be paid upon invoice by the physician to the company. However, they do not indicate the "aggregate" compensation or, since the services were being provided on a periodic, part-time and sporadic basis, the schedule of services as required by 42 C.F.R. § 1001.952(d).

109.    Sometimes physicians received one or more additional SOWs after signing the original Agreement.[24] These SOWs violate the regulations when they are dated sometime after the date of the Agreement but indicate that they are subject to the terms and conditions of the original Agreement. This means that the SOW is for a term of less than a year thereby taking the personal service contract out of the safe harbor.

110.    Receipt of multiple SOWs also made the Contracts more *ad hoc*: contrary to the regulations requiring a plan for utilization and payment of the physician, the pattern at Covidien was that a new SOW was created when a new way to pay a physician came up and that payment would serve sales goals. For example, one physician provided ev3 employee certification training in the spring of 2009 pursuant to a Second SOW. Then on September 22, 2009, he signed a Fourth SOW to provide proctoring on the use of TurboHawk, which he was scheduled to perform three days later, on September 25, 2009.

111.    This *ad hoc* planning sometimes resulted in physicians performing personal service work without a contract in place, or at a minimum required the physician education team to scramble to get the paperwork in place. For example, the physician referenced in the paragraph above did not submit his signed Agreement until after the initial trainings were

---

[24] James McKinsey, M.D. had at least 20 SOWs.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

completed, and obviously the timing was close between his Fourth SOW and the date he was to perform the service.

112.    During Director Grant's tenure, the number of doctors on Agreements increased significantly, primarily due to the staff training that was implemented. The sheer number of doctors being used for physician education made it more difficult for the small team to ensure that contracts were up-to-date and in place for every activity involving payment to a physician.

113.    As further evidence of the influence of marketing on personal service contracts, Covidien's Vice President of Marketing typically signed all of the physician Agreements and SOWs.

### 4.    Covidien Used Workarounds to Satisfy Physician Demands and Sidestep Contract Limitations

114.    Relator worked with Covidien's Legal Department to do what she could to keep the physician education programs within the AKS safe harbor, including establishing fair market value for particular kinds of work, using established parameters for the work and pay offered to physician consultants, and trying to keep up with the need for new or modified Agreements and SOWs.

115.    Throughout the time she worked with him, Don Grant routinely come to Relator and asked how a particular physician could be paid more. This request often originated with sales personnel telling Grant that a particular doctor was demanding more money. Grant repeatedly told Relator words to the effect "We need to support this or we'll lose [doctor's name] as a customer. We need to figure it out. Do whatever you need to do to get it done." Sometimes Relator was able to justify requests. When she had to tell Grant that she could not do what was asked, she often had the sense that he went ahead and figured out some way to increase the payment anyway or otherwise satisfy the physician.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

116.   Relator had numerous conversations with Grant in which she objected to making payments to particular doctors as outside the scope of what was legal for physician education. Besides the systemic violations described above, Relator observed individual instances where sales trumped physician education and specific physicians were paid for services in violation of safe harbor rules.

### a.   Dr. James Williams

117.   Dr. James Williams is a physician in Peoria, Illinois who is board certified in surgery, thoracic surgery and vascular surgery. He is President of Cardiac Thoracic and Endovascular Therapies, S.C. He also is the Director of an Endovascular Therapies Fellowship Training ("ETFT") program through his practice. The ETFT website lists ev3 and two other businesses as "Industry Associates." [25]

118.   In 2009, Dr. Williams requested a grant of $60,000 from ev3 for the program, which was not awarded. A September 1, 2009 letter from the Vice President of Regulatory Affairs stated that ev3's Grants Committee could not make the award because the request "was not in line with ev3's policies." Regardless, sales personnel pushed physician education personnel to find other ways to compensate Dr. Williams. Grant told Relator, "we need to make this Williams thing work. . . ."

119.   Effective September 11, 2009, Dr. Williams was offered and signed an Independent Consultant Agreement with an SOW describing his services as proctoring physicians who would observe him for a day and for which he would be paid $1,500 per day.

120.   In April of 2010, Dr. Williams was invited to join the ev3 Centers of Excellence faculty and he signed a SOW retaining him to do hands-on training of physicians. The letter to

---

[25] http://www.endovascularfellowshiptraining.com/endovascular-fellowship-training-curriculum.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

him noted that the Centers of Excellence Programs were generally 2-day hands on courses with a minimum of 5 live cases each day and an evening discussion or presentation, but in his case the program was shortened to one day followed by a dinner presentation, for which he would be paid $3,000 per day.

121.   Dr. Williams then billed ev3 for three hands-on training sessions with Dr. Joe McClain, over about a six-week period. He also billed ev3 for an October 2010 hands-on training session with Dr. Paula Guinnip. Both Dr. McClain and Dr. Guinnip were ETFT fellows in Dr. Williams's program. On information and belief, the Fellows already were paying Dr. Williams to participate in the program. Dr. Williams had billed ev3 for another $12,000 for the same training, taking the Company's payment to Dr. Williams out of the category of compensation for bona fide services.

122.   Relator approved the payments but only after being sure she had case notes documenting the hands-on training, which created the appearance of following the Agreement and applicable SOW.

123.   In planning for the following year, Relator put Dr. Williams on the schedule as offering hands-on training that should have been open to any of the physicians serviced by the Physician Education Department.

124.   On October 5, 2011, Relator sent an email to Mark Davis, the RM for Dr. Williams's region, telling him that Dr. Williams was being scheduled and budgeted for four Hands-on Courses for the next fiscal year. She asked Davis to contact Dr. Williams and request course dates within each quarter. Then she notified other ev3 personnel that Dr. Williams's site was a new one that would need credentialing.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

125.    That same day, Relator's supervisor, Macaire Merkel made it clear that payment to Dr. Williams for Hands-on Courses was really a subterfuge to give him additional money for his ETFT program. She emailed Relator and Davis and said "Just so we're all clear, this is how we're supporting the ETFT Program. We don't need any actual dates, just confirmation that we're all on the same sheet of music. We will need the fellows' names at the time of invoicing." Merkel also informed the persons responsible for site credentials that they should "Scratch Williams; these aren't actually new hands-on courses, this is just how we're supporting his fellowship program."

### b.    Dr. Rajesh Dave

126.    Dr. Rajesh Dave is a Cardiologist in Pennsylvania.

127.    In the April of 2009, Dr. Dave was offered and signed an Independent Consulting Agreement and First Statement of Work to serve as a "clinical trainer for company's employees for a two-day training session" related to the SilverHawk product.  The compensation was designated as $1,500 per attendee for up to a maximum of four attendees, not to exceed $6,000 for the two-day session.

128.    Dr. Dave sent Relator an invoice for $4,500 for a one-day training for three attendees. Don Grant asked her "How can we get him up to this amount?" Dr. She responded that the amount he demanded was beyond fair market value for his services and she couldn't do it. Relator then told Grant, "I don't look good in orange." Grant did not deny the illegality of what he was asking, but instead told her not to worry.  He assured her that she would not be the one to take the fall—it would be higher management.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

### c.  Dr. James McKinsey

129.  Dr. James McKinsey is the Chief of Vascular and Endovascular Surgery at Columbia University in New York City. He is a very high user of the Products and was treated with kid gloves by the Covidien sales force.

130.  In the summer of 2011, there was a flurry of email about whether Dr. McKinsey had received all the payments due him for various programs and whether Covidien could pay him more quickly.

131.  Relator pointed out that he did not receive a payment for a May program, because he did not do the work. The work and the pay were given to another physician when Dr. McKinsey asked to cancel the program.

132.  It also was discovered that a proper contract did not appear to be in place for fellowship payments of $20,000 per quarter that he had received.

133.  Apparently, in the fall of 2011 there was discussion about another canceled course. In an email dated October 20, 2011, Merkel disclosed the kinds of workarounds that she used to pay physicians to keep them happy so that they would continue to use the Products. Merkel instructed Relator that "Reid and I are going to handle the messaging to McKinsey around next week's canceled course later today, so don't say anything to anyone in his office at this point." She told Relator that the plan was probably to take money designated for the course and give him 2 TLFs [Thought Leader Forums] later "to make him happy."

### d.  Dr. Robert Bersin

134.  Dr. Robert Bersin is the Medical Director, Endovascular Services, Seattle Cardiology and Swedish Medical Center, Seattle, Washington. Defendants have identified Dr.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

Bersin as a "Hawker" and have retained him to speak at Peer-to-Peer events and for hands-on training courses.

135.    Dr. Bersin submitted an invoice to Relator for a $10,000 payment, which she recognized as an invoice for training his own fellow. Because the invoice did not represent bona fide services performed for Covidien, she refused to approve the invoice and so informed Merkel.

136.    On October 13, 2011, Don Grant sent an email to Dr. Bersin claiming that there was a "miscommunication" around his course earlier that week and offering to accommodate his request for particularized payment amounts and options for proffered training program. Grant told him "we have been working through our payment options over the last day and a half and believe we will be able to offer a workable solution." However, Grant was unwilling to articulate that solution in writing. He wrote Dr. Bersin, "I would like to sit down and discuss in person. I understand you will be at VIVA . . . Please let me know if you have availability to sit and discuss with us."

### G.    Covidien's Use of Kickbacks to Induce Sales Was Knowing and Intentional

137.    The above paragraphs show that besides being functionally embedded in the Marketing Department, the work of the Physician Education Department was largely driven by the priorities and needs of the Peripheral Vascular sales force. Put another way, Director Grant, in conjunction with the AVPs and Peripheral Vascular sales force used the physician education function to induce sales.  They did this by paying physicians for personal services with the purpose of initially motivating them to use the SilverHawk and TurboHawk Plaque Excision Products and then, to increase that use. This conduct, the flawed use of the Agreements and SOWs, and the managers' willingness and ability to sidestep legal requirements to satisfy

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

physician demands took the payments to physicians outside the AKS safe harbor. These payments therefore constituted kickbacks to the physicians.

138.    Also, the use of luxury hotels and resorts for the Hawk and Region Summit meetings constituted illegal kickbacks, as the venue for the meetings can hardly be characterized as "modest," as required by Covidien's adopted Code of Ethics.

139.    Early on, Relator had the discussion with Grant about Dr. Dave's request for amounts beyond fair market value. When Relator said she doesn't look good in orange, Grant told her not to worry, but did not deny the illegality of what he was asking. Then he admitted that higher management would be responsible, an admission that they knew what they were doing.

140.    That Defendants violations of the AKS and the FCA were knowing and intentional is particularly evident in Grant's statements to Relator related to her going to prison, and Merkel's email asking Relator to confirm "that we're all on the same sheet of music" in making payments to support Dr. Williams fellowship program under the guise of hands-on training.

141.    Additionally, many of the facts above, including Covidien's adoption of the AdvaMed Code of Ethics, the sales-oriented culture in the Physician Education Department, the communications about sidestepping safe harbor requirements, and the instruction to fill training classes regardless of the need for training, all point to deliberate and knowing use of personal service payments to induce sales. Covidien typically used the trappings of contracting for doctors' services to make it look like they were complying with the safe harbor provisions of the AKS, but the ultimate goal of the educational services was increased utilization of the SilverHawk and TurboHawk Plaque Excision System.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

142.     Defendant's scheme to use claimed personal service payments as kickbacks to physicians was knowing, intentional, systemic, and implemented through its national marketing, sales, and physician education operations.

143.     By paying kickbacks that induced physicians and health care facilities to present claims to the government for payment for the SilverHawk and TurboHawk Products, Defendants necessarily, knowingly and intentionally caused those providers to make false claims that they did not accept illegal kickbacks.  This is because Defendants know that physicians and health care facilities must certify to government health care programs, as a condition of doing business, that they are in compliance with applicable laws and regulations including the AKS. These false claims are material because payment for Products sold through illegal kickbacks would be disqualified for payment from the applicable government health care programs if the use of kickbacks in their inducement was known.

144.     The federal and state governments were harmed by this conduct because the kickbacks thwarted their goal of ensuring that government-pay health care decisions are made free of inappropriate and undue corporate influence.

### VI.     Defendants Retaliated Against Relator for Challenging Conduct that Violates the AKS and Federal and State False Claims Acts

145.     Relator Hallam began working at ev3 in July of 2008 as a non-exempt employee. In her first performance review in January of 2009, her supervisor, Lauryl Fowler, described her as having a strong work ethic, flexible, and motivated. Fowler stated "Brooke's positive and energetic approach with physicians, in-house and remote team members is a key element in her successful execution of responsibilities." Fowler rated Relator's work for 2008 at the "Achieved" level. That indicates that the employee "consistently performs at the expected level of contribution. Employee has a solid skill foundation that will allow him/her to succeed."

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

146.    Just a year later, in August 2009, Relator was promoted to the position "Physician Education Specialist," which carried exempt status. She also received a pay increase of about 10%, and an 8% bonus.

147.    In her January 2010 performance review for her work in 2009, Relator's manager, Lauryl Fowler, again gave her an "Achieved" rating and a weighted achievement level of 3.25 on a 4.0 scale Among the comments, Fowler noted "Brooke's ability to multi-task and successfully manage daily routine tasks is excellent. In 2009 Brooke exhibited strong performance and an increase in her workload, with consistent delivery of quality programs. She is always eager to improve upon any process that needs attention. Brooke not only achieves the tasks set before her, she very commonly takes proactive measures to ensure team success at levels." Fowler also commended Relator for taking compliance responsibilities seriously: "Brooke has followed all of the changes in policy and adapted her processes to ensure she includes every necessary detail for compliance."

148.    In June of 2010, Relator received a bonus of $5,000.

149.    In July 2010, Covidien purchased ev3.

150.    In August 2010, Macaire Merkel became Relator's supervisor. Merkel had the title Manager, Physician Education, and reported directly to Don Grant, the Director of Physician Education.

151.    In early 2011, Hallam received a rating of "Achieved" from Merkel in her performance review for 2010, accompanied by a 3% merit increase. Among the specific comments, Merkel observed that she "displays a strong commitment to ev3's value of teamwork," "strives to provide the highest quality education experience possible and delight our customers in the process," "consistently delivers solid programming in the face of ever-

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

increasing demands on her time and energy," and "is able to work independently, takes pride in her work, and wants to excel." Merkel also noted she could count on Relator "for a candid opinion at any time." In the review, and among other things, Merkel said "Brooke has a clear mastery of her job responsibilities as an Associate Physician Education Specialist. She is able to work independently, takes pride in her work, and wants to excel."

152.    For her success on management objectives set for 2010, Relator received a final rating of 3.4 on a 5.0 scale, for which she received a bonus of $4,591.88.

153.    Throughout her tenure at Defendants, Relator tried to perform her duties ethically and in compliance with the AdvaMed Code of Ethics. She challenged efforts to just give physicians what they wanted, and repeatedly questioned her supervisor, Merkel and the Director of her department, Don Grant, about illegal business practices that violate the AKS and federal and state FCAs.   She also resisted taking action or making payments that were not legally justified, including, but not limited to, paying physicians more money than deemed fair market value; recruiting physicians to train Defendants' employees without any assessment of their qualifications for the task; paying physicians for training that was not needed; filling up classes with already-trained employees to ensure a particular payment for a physician; using workarounds to avoid objections from the legal department about particular payments; paying physicians for work that was not done. She questioned the involvement of TMs and RMs in physician education decisions, and challenged the amount of control exercised by the sales force. She asked Grant, for example, whether they needed to pay someone over market value simply because an RM wanted to use that person. She refused to rubber stamp requests from her managers to do whatever it took to pay a particular amount to a doctor.  And she resisted efforts to keep her from actually working with the physicians.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

154.    In 2011, Relator began to experience her work environment as hostile to her efforts to run physician education programs that met ethical requirements and were not controlled by the sales staff. She noticed that she would be left out of conversations about how situations should be handled; Grant and Merkel would meet one-on-one and then Merkel would tell Relator what she needed to do. Relator could tell they were not keeping her in the loop because things would happen that she did not know about.

155.    On May 5, 2011, Merkel put Relator on a Performance Improvement Plan ("Plan"). Some of the stated performance issues were untrue, and others were make-weight or exaggerations of routine issues that arise from time to time in educational programming.

156.    This action was completely unexpected and without prior warning. Relator submitted a response to the review identifying reasons why the criticisms were inaccurate and did not warrant placement on a performance improvement plan, particularly for an exempt employee who was expected to work independently and who had received favorable performance reviews.

157.    The Plan went from May 5, 2011 through July 3, 2011. Although Relator disagreed with the Plan, she fully achieved the objectives outlined in it. Defendant had no choice but to take her off the Plan in July.

158.    Relator continued to perform her duties, to exercise care in approving payments to physicians, and to attempt to plan proper physician education programs. She set up meetings with Merkel to keep her updated on her work and Merkel blew them off.

159.    Unable to force Relator to leave through the Plan, Merkel told Relator in the fall that her employment was in jeopardy. Merkel told her "I'm getting pressure from outside and legal to let you go in 45 days." This sent a clear message to Relator that her job was on the block

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

because she challenged and refused to go along with questionable and outright illegal conduct with respect to physician education.

160.    Merkel did not disclose any other information except that Relator was a target and was being pushed out, and Merkel could not do anything for her. When Relator asked Grant what was happening, he said she would have to talk to Merkel and did not provide any further explanation.

161.    In October, Relator received the invoice from Dr. Bersin seeking $10,000 for a hands-on training for a physician who was already a Fellow in his department. Relator told Merkel that this was not legal and she refused to approve the payment. As discussed above, Grant contacted Dr. Bersin and told him he had worked something out and they would talk in person about the payment.

162.    Also in October, and in the course of planning for the next fiscal year, Relator sent out the email discussed above asking a TM to get dates from Dr. Williams for future hands-on training. Relator believed that to be ethical, hands-on training sessions should be scheduled and made available to any physician across the country. Her efforts to achieve this goal were immediately squelched by Merkel's email telling her she had to get on the "same sheet of music" and that Dr. Williams's hands-on training days should not be made available to others.

163.    Relator was informed on October 27, 2011, that she would be terminated effective November 2, 2011.

164.    As a direct and proximate result of Defendants' conduct, relator has sustained loss of earnings and earning capacity, has incurred expenses in her resulting unemployment and search for future employment, and has suffered and will continue to suffer emotional distress,

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

embarrassment, humiliation and loss of self-esteem. Relator has also incurred attorney's fees and expenses and other related damages.

## COUNT I
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

Relator realleges each and every paragraph of this Complaint.

165.    By the acts described above, Defendants knowingly presented or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).[26]

166.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).[27]

167.    The United States, unaware of the falsity or fraudulent nature of the claims presented or caused to be presented by Defendants, paid for claims that otherwise would not have been paid because of Defendants' illegal kickbacks.

168.    Because of the Defendants' acts, and by reason of these payments and benefits given, the United States sustained damages and continues to be damaged in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

---

[26] To the extent that illegal conduct occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the federal False Claims Act prior to its amendment in 2009. Specifically Count I therefore also alleges violations of 31 U.S.C. § 3729(a)(1).

[27] To the extent that illegal conduct occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the federal False Claims Act prior to its amendment in 2009. Specifically Count II therefore also alleges violations of 31 U.S.C. § 3729(a)(2).

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## COUNT II
## STATE OF CALIFORNIA

Relator realleges each and every paragraph of this Complaint.

169.    This is a claim for treble damages and penalties under California's False Claims Act, Cal. Gov't Code § 12651(a) (West 2014).

170.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

171.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the California State Government to approve and pay false and fraudulent claims.

172.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid for claims that would not be paid because of Defendants' illegal kickbacks.

173.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged in substantial amount to be determined at trial.

174.    The State of California is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT III
## STATE OF COLORADO

Relator realleges each and every paragraph of this Complaint.

175.    This is a claim for treble damages and penalties under Colorado's Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-305 (2014).

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

176.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

177.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Colorado State Government to approve and pay false and fraudulent claims.

178.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

179.    By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged in substantial amount to be determined at trial.

180.    The State of Colorado is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT IV
## STATE OF CONNECTICUT

Relator realleges each and every paragraph of this Complaint.

181.    This is a claim for treble damages and penalties under Connecticut's False Claims Act, Conn. Gen. Stat. § 17b-301b (2014).

182.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

183.  By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Connecticut State Government to approve and pay false and fraudulent claims.

184.  The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

185.  By reason of Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged in substantial amount to be determined at trial.

The State of Connecticut is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT V
## STATE OF DELAWARE

Relator realleges each and every paragraph of this Complaint.

186.  This is a claim for treble damages and penalties under Delaware's False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 (2014).

187.  By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

188.  By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Delaware State Government to approve and pay false and fraudulent claims.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

189.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

190.     By reason of Defendants' acts, the State of Delaware has been damaged, and continues to be damaged in substantial amount to be determined at trial.

191.     The State of Delaware is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT VI
### DISTRICT OF COLUMBIA

Relator realleges each and every paragraph of this Complaint.

192.     This is a claim for treble damages and penalties the under the District of Columbia's False Claims Act, D.C. Code § 2-381.02 (2014).

193.     By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

194.     By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the District of Columbia Government to approve and pay false and fraudulent claims.

195.     The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

196.    By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged in substantial amount to be determined at trial.

197.    The District of Columbia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT VII
## STATE OF FLORIDA

Relator realleges each and every paragraph of this Complaint.

198.    This is a claim for treble damages and penalties under Florida's False Claims Act, Fla. Stat. § 68.082 (2014).

199.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

200.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Florida State Government to approve and pay false and fraudulent claims.

201.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

202.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged in substantial amount to be determined at trial.

203.    The State of Florida is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## COUNT VIII
## STATE OF GEORGIA

Relator realleges each and every paragraph of this Complaint.

204.    This is a claim for treble damages and penalties under Georgia's State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1 (2014).

205.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

206.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Georgia State Government to approve and pay false and fraudulent claims.

207.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

208.    By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged in substantial amount to be determined at trial.

209.    The State of Georgia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT IX
## STATE OF HAWAII

Relator realleges each and every paragraph of this Complaint.

210.    This is a claim for treble damages and penalties under Hawaii's False Claims Act, Haw. Rev. Stat. § 661-21 (2014).

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

211.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

212.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Hawaii State Government to approve and pay false and fraudulent claims.

213.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

214.    By reason of Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged in substantial amount to be determined at trial.

215.    The State of Hawaii is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT X**
**STATE OF ILLINOIS**

Relator realleges each and every paragraph of this Complaint.

216.    This is a claim for treble damages and penalties under Illinois' Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3 (2014).

217.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

218.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Illinois State Government to approve and pay false and fraudulent claims.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

219.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

220.    By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged in substantial amount to be determined at trial.

221.    The State of Illinois is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XI**
**STATE OF INDIANA**

Relator realleges each and every paragraph of this Complaint.

222.    This is a claim for treble damages and penalties under Indiana's False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-2 (2014).

223.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

224.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Indiana State Government to approve and pay false and fraudulent claims.

225.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

226.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged in substantial amount to be determined at trial.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

227.    The State of Indiana is entitled to the maximum penalty of at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XII
## STATE OF IOWA

Relator realleges each and every paragraph of this Complaint.

228.    This is a claim for treble damages and penalties under Iowa's False Claims Act, Iowa Code § 685.2 (2014).

229.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

230.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Iowa State Government to approve and pay false and fraudulent claims.

231.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

232.    By reason of Defendants' acts, the State of Iowa has been damaged, and continues to be damaged in substantial amount to be determined at trial.

233.    The State of Iowa is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIII
## STATE OF LOUISIANA

Relator realleges each and every paragraph of this Complaint.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

234.   This is a claim for treble damages and penalties under Louisiana's Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:438.3 (2014) and La. Rev. Stat. § 46:438.6 (2014).

235.   By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

236.   By virtue of the acts alleged above, Defendants knowingly engaged in misrepresentation to obtain, or attempt to obtain payment from the Louisiana State Government.

237.   The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

238.   By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged in substantial amount to be determined at trial.

239.   The State of Louisiana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIV
## STATE OF MARYLAND

Relator realleges each and every paragraph of this Complaint.

240.   This is a claim for treble damages and penalties under Maryland's False Health Claims Act, Md. Code Health-Gen. § 2-601(a) (2014).

241.   By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

242.    By virtue of the acts alleged above, Defendants knowingly engaged in misrepresentation to obtain, or attempt to obtain payment from the Maryland State Government.

243.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

244.    By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged in substantial amount to be determined at trial.

245.    The State of Maryland is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XV
### COMMONWEALTH OF MASSACHUSETTS

Relator realleges each and every paragraph of this Complaint.

246.    This is a claim for treble damages and penalties under Massachusetts' False Claims Act, Mass. Gen. Laws ch. 12, § 5B(a) (2014).

247.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Government of the Commonwealth of Massachusetts for payment or approval.

248.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Government of the Commonwealth of Massachusetts to approve and pay false and fraudulent claims.

249.    The Government of the Commonwealth of Massachusetts, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

250. By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged in substantial amount to be determined at trial.

251. The Commonwealth of Massachusetts is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVI
## STATE OF MICHIGAN

Relator realleges each and every paragraph of this Complaint.

252. This is a claim for treble damages and penalties under Michigan's Medicaid False Claim Act, Mich. Comp. Laws §§ 400.607 and 400.612 (2014).

253. By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

254. By virtue of the acts alleged above, Defendants knowingly made, and presented claims that falsely represented the goods for which the claim was made to induce the Michigan State Government to approve and pay false and fraudulent claims.

255. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

256. By reason of Defendants' acts, the State of Michigan has been damaged, and continues to be damaged in substantial amount to be determined at trial.

257.    The State of Michigan is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVII
## STATE OF MINNESOTA

Relator realleges each and every paragraph of this Complaint.

258.    This is a claim for treble damages and penalties under Minnesota's False Claims Act, Minn. Stat. § 15C.02 (2013).

259.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

260.    By virtue of the acts alleged above, Defendants knowingly made, and presented claims that falsely represented the goods for which the claim was made to induce the Minnesota State Government to approve and pay false and fraudulent claims.

261.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

262.    By reason of Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged in substantial amount to be determined at trial.

263.    The State of Minnesota is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

## COUNT XVIII
## STATE OF MONTANA

Relator realleges each and every paragraph of this Complaint.

264.    This is a claim for treble damages and penalties under Montana's False Claims Act, Mont. Code Ann. § 17-8-403 (2013).

265.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

266.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Montana State Government to approve and pay false and fraudulent claims.

267.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

268.    By reason of Defendants' acts, the State of Montana has been damaged, and continues to be damaged in substantial amount to be determined at trial.

269.    The State of Montana is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XIX
## STATE OF NEVADA

Relator realleges each and every paragraph of this Complaint.

270.    This is a claim for treble damages and penalties under Nevada's Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. 357.040 (2013).

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

271.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

272.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Nevada State Government to approve and pay false and fraudulent claims.

273.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

274.    By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged in substantial amount to be determined at trial.

275.    The State of Nevada is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XX**
**STATE OF NEW HAMPSHIRE**

Relator realleges each and every paragraph of this Complaint.

276.    This is a claim for treble damages and penalties under New Hampshire's Medicaid Fraud and False Claims, N.H. Rev. Stat. Ann. § 167:61-b (2014).

277.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

278.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay false and fraudulent claims.

279.    The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

280.    By reason of Defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged in substantial amount to be determined at trial.

281.    The State of New Hampshire is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXI
STATE OF NEW JERSEY**

Relator realleges each and every paragraph of this Complaint.

282.    This is a claim for treble damages and penalties under New Jersey's False Claims Act, N.J. Stat. Ann. § 2A:32C-3 (2014).

283.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

284.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New Jersey State Government to approve and pay false and fraudulent claims.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

285.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

286.    By reason of Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged in substantial amount to be determined at trial.

287.    The State of New Jersey is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXII
## STATE OF NEW MEXICO

Relator realleges each and every paragraph of this Complaint.

288.    This is a claim for treble damages and penalties under New Mexico's Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-4 (2014) and Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-3 (2007).

289.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

290.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New Mexico State Government to approve and pay false and fraudulent claims.

291.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

292.    By reason of Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged in substantial amount to be determined at trial.

293.    The State of New Mexico is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXIII**
**STATE OF NEW YORK**

Relator realleges each and every paragraph of this Complaint.

294.    This is a claim for treble damages and penalties under New York's False Claims Act, N.Y. State Fin. Law § 189 (2013).

295.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

296.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the New York State Government to approve and pay false and fraudulent claims.

297.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

298.    By reason of Defendants' acts, the State of New York has been damaged, and continues to be damaged in substantial amount to be determined at trial.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

299.    The State of New York is entitled to the maximum penalty of $12,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXIV
## STATE OF NORTH CAROLINA

Relator realleges each and every paragraph of this Complaint.

300.    This is a claim for treble damages and penalties under North Carolina's False Claims Act, N.C. Gen. Stat. § 1-607 (2014).

301.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

302.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the North Carolina State Government to approve and pay false and fraudulent claims.

303.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

304.    By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged in substantial amount to be determined at trial.

305.    The State of North Carolina is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## COUNT XXV
## STATE OF OKLAHOMA

Relator realleges each and every paragraph of this Complaint.

306.    This is a claim for treble damages and penalties under Oklahoma's Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.1 (2014).

307.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

308.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay false and fraudulent claims.

309.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

310.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged in substantial amount to be determined at trial.

311.    The State of Oklahoma is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXVI
## STATE OF RHODE ISLAND

Relator realleges each and every paragraph of this Complaint.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

312.     This is a claim for treble damages and penalties under the Rhode Island's State False Claims Act, R.I. Gen. Laws § 9-1.1-3 (2014).

313.     By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

314.     By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay false and fraudulent claims.

315.     The Rhode Island State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

316.     By reason of Defendants' acts, the State of Rhode Island has been damaged, and continues to be damaged in substantial amount to be determined at trial.

317.     The State of Rhode Island is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXVII
STATE OF TENNESSEE**

Relator realleges each and every paragraph of this Complaint.

318.     This is a claim for treble damages and penalties under Tennessee's Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 (2014) and Tennessee's False Claims Act, Tenn. Code Ann. § 4-18-101 (2014).

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

319.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

320.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Tennessee State Government to approve and pay false and fraudulent claims.

321.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

322.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged in substantial amount to be determined at trial.

323.    The State of Tennessee is entitled to the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXVIII
STATE OF TEXAS**

Relator realleges each and every paragraph of this Complaint.

324.    This is a claim for double damages and penalties under Texas' Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.002 and 36.052 (2013).

325.    By virtue of the acts alleged above, Defendants knowingly made or caused to be made false statements and misrepresentations of material facts to permit persons to receive a benefit or payment under the Medicaid program that is not authorized.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

326.    By virtue of the acts alleged above, Defendants knowingly made, induced, sought to induce or caused to be made false statements and misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

327.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

328.    By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged in substantial amount to be determined at trial.

329.    The State of Texas is entitled to the maximum penalty of $11,000 or $15,000 (if the false claim results in injury to an elderly, disabled, or person younger than 18-years-old) for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXIX
## COMMONWEALTH OF VIRGINIA

Relator realleges each and every paragraph of this Complaint.

330.    This is a claim for treble damages and penalties under Virginia's Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3 (2014).

331.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Government of the Commonwealth of Virginia for payment or approval.

332.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Government of the Commonwealth of Virginia to approve and pay false and fraudulent claims.

66

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

333.   The Government of the Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

334.   By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged in substantial amount to be determined at trial.

335.   The Commonwealth of Virginia is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXX
## STATE OF WASHINGTON

Relator realleges each and every paragraph of this Complaint.

336.   This is a claim for treble damages and penalties under Washington's Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.020 (2014).

337.   By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

338.   By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Washington State Government to approve and pay false and fraudulent claims.

339.   The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

340.    By reason of Defendants' acts, the State of Washington has been damaged, and continues to be damaged in substantial amount to be determined at trial.

341.    The State of Washington is entitled to the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXXI
## STATE OF WISCONSIN

Relator realleges each and every paragraph of this Complaint.

342.    This is a claim for treble damages and penalties under Wisconsin's False Claims Act, Wis. Stat. § 20.931 (2014).

343.    By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

344.    By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used false records or statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay false and fraudulent claims.

345.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid because of Defendants' illegal kickbacks.

346.    By reason of the defendant's acts, the State of Wisconsin has been damaged, and continues to be damaged in substantial amount to be determined at trial.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

347.    The State of Wisconsin is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXXII
## RETALIATION IN VIOLATION OF THE
## FALSE CLAIMS ACT

Plaintiff realleges each and every paragraph of this Complaint.

348.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

349.    Plaintiff was unlawfully threatened, disciplined, and discharged by Defendants in retaliation for lawful acts done by her on behalf of the United States and the general public in furtherance of an action under this section or other efforts to stop one or more violations of the False Claims Act. Defendants violated 31 U.S.C. § 3730(h)(1) when it retaliated against relator for exercising her rights under the False Claims Act.

350.    As a direct result of Defendants' unlawful retaliatory termination, Plaintiff has experienced damages for which she is entitled relief under 31 U.S.C. § 3730(h)(2).

## COUNT XXXIII
## RETALIATION IN VIOLATION OF THE
## MINNESOTA FALSE CLAIMS ACT

Plaintiff realleges each and every paragraph of this Complaint.

351.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

352.    Plaintiff was unlawfully threatened, disciplined, and discharged by Defendants in retaliation for lawful acts done by her on behalf of the United States and the general public in furtherance of an action under this chapter or other efforts to stop one or more violations of the

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

False Claims Act. Defendants violated Minn. Stat. § 15C.145when it retaliated against Plaintiff for exercising her rights under the Minnesota False Claims Act.

353. As a direct result of Defendants' unlawful retaliatory termination, Plaintiff has experienced damages for which she is entitled relief under Minn. Stat. 15C.145(b).

**COUNT XXXIII**
**WRONGFUL DISCHARGE IN**
**VIOLATION OF PUBLIC POLICY**

Plaintiff realleges each and every paragraph of this Complaint.

354. Plaintiff was wrongfully discharged by Defendants, in violation of public policy, for, in good faith, reporting, objecting to, trying to eliminate, and refusing to participate in illegal kickback activities in her business that also resulted in violations of the federal and state False Claims Acts.

355. Plaintiff's discharge was for reasons that contravene multiple clearly mandated public policies. These include but are not limited to public policies underlying the (1) Anti-Kickback Statute, which prohibits kickbacks to health care providers to ensure that patient care is not compromised by improper influence from the health care industry; (2) federal and state False Claims Acts, which protect the public fisc from illegal corporate conduct; (3) Patient Protection and Affordable Care Act, which reinforces patient protection by expressly declaring that violations of the Anti-Kickback Statute also constitute violations of the False Claims Act; and (4) anti-retaliation provisions of the federal and Minnesota False Claims Act, which provide protection to individuals who report and refuse to participate in violations of the federal and state False Claims Acts, for the purpose of enforcing those important statutes.

356. Plaintiff acted in good faith, in reporting, objecting to, trying to eliminate, and refusing to participate in Defendants' illegal kickback activities, because she reasonably believed

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

that the conduct violated the Anti-Kickback Statute, thereby also causing violations of federal and state False Claims Act.

357.    The unlawful practices complained of above and Plaintiff's wrongful discharge were intentional and performed by Defendants with malice or with reckless indifference to the rights or safety of Plaintiffs and others.

358.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained loss of earnings and earning capacity, has incurred expenses in her resulting unemployment and search for future employment, and has suffered and will continue to suffer emotional distress, embarrassment, humiliation and loss of self-esteem. Plaintiff has also incurred attorney's fees and expenses and other related damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff/Relator Brook Hallam, the United States of America, and the FCA States request that this Court:

A.    Enter judgment for the United States Government, the FCA States and the Plaintiff/Relator and against Defendants jointly and severally;

B.    Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.* and the FCA States' counterparts;

C.    Award the United State Government three times the amount of the actual damages sustained by the government as a result of Defendants' violations of the False Claims Act as alleged in this Complaint;

D.    Assess civil penalties of $11,000.00 but not less than $5,500.00 against the Defendants for each and every false claim submitted by the Defendants to the United States

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

government in connection with the false statements, false claims and conspiracy alleged in this complaint;

E.      Award the Plaintiff/Relator the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and the equivalent statutory provisions in the FCA States;

F.      Award each of the FCA States on whose behalf this Complaint has been brought,

1.  an amount equal to the damages sustained because of defendant's conduct, multiplied by the maximum multiplier, if any, allowed by each FCA State;

2.  a penalty of the maximum statutory amount allowed for each violation of the equivalent false claims act of each FCA State, and

3.  any other damages, awards, penalties and equitable relief available under the equivalent false claims act of the FCA States.

G.      Award prejudgment interest;

H.      Award the Plaintiff/Relator statutory attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d); and its counterparts in the FCA States.

I.      Award the Plaintiff/Relator, with respect to her federal and state retaliation and wrongful discharge claims:

1.  Two times the amount of back pay that she would have had but for the retaliation, and interest on the back pay;

2.  Compensation for all special damages, including emotional distress, sustained as a result of the retaliation and discharge, in an amount to be determined at trial;

3.  Front pay in an amount to be determined at trial;

4.  Punitive damages for the wrongful discharge claim;

72

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

     5.  Litigation costs and reasonable attorneys' fees.

J.      Grant such other relief as the Court may deem just, necessary, and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE JURY IS AVAILABLE.**

Dated October 23, 2014          MICHAEL A. JOHNSON & ASSOCIATES

_____

Michael A. Johnson,  IL Atty No. 51065
415 N. LaSalle, Suite 502
Chicago, IL 60654
Telephone:  (312)222-0660

HALUNEN & ASSOCIATES

Susan M. Coler, MN Atty No. 217621,
IL Atty No. 6201012
Clayton D. Halunen,  MN Atty No. 219721
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099

ATTORNEYS FOR PLAINTIFF/RELATOR

## U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
### ATTORNEY APPEARANCE FORM

NOTE: In order to appear before this Court an attorn
standing of this Court's general bar or be granted lea
by Local Rules 83.12 through 83.14.

1:14-cv-08331
Judge Ruben Castillo
Magistrate Judge Daniel G. Martin

In the Matter of   *Suppressed V. Suppressed*     Case Number:

AN APPEARANCE IS HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY FOR:

*Suppressed*

**FILED**

OCT 2 3 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| NAME (Type or print) *Michael Alon Johnson* | |
| SIGNATURE (Use electronic signature if the appearance form is filed electronically) s/ *[signature]* | |
| FIRM *Michael A. Johnson & Associates* | |
| STREET ADDRESS *415 N LaSalle, Suite 502* | |
| CITY/STATE/ZIP *Chicago IL 60654* | |
| ID NUMBER (SEE ITEM 3 IN INSTRUCTIONS) *6181982* | TELEPHONE NUMBER *312-282-0660* |
| ARE YOU ACTING AS LEAD COUNSEL IN THIS CASE?   ~~YES~~   NO | |
| ARE YOU ACTING AS LOCAL COUNSEL IN THIS CASE?   ~~YES~~   NO | |
| ARE YOU A MEMBER OF THIS COURT'S TRIAL BAR?   ~~YES~~   NO | |
| IF THIS CASE REACHES TRIAL, WILL YOU ACT AS THE TRIAL ATTORNEY?   ~~YES~~   NO | |
| IF THIS IS A CRIMINAL CASE, CHECK THE BOX BELOW THAT DESCRIBES YOUR STATUS.   RETAINED COUNSEL          APPOINTED COUNSEL | |

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA, et al.,
ex rel. BROOKE HALLAM, Plaintiff -Relator

## DEFENDANTS
EV3 ENDOVASCULAR, INC. (d/b/a EV3 INC.), TYCO HEALTHCARE GROUP LP (d/b/a COVIDIEN); and COVIDIEN, PLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ___Hennepin___
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**FILED**

**OCT 23 2014**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Attachment

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**1:14-cv-08331**
**Judge Ruben Castillo**
**Magistrate Judge Daniel G. Martin**

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of I | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 | |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | | |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | | |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | | |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
False Claims Act , 31 U.S.C. § 3729 et seq.
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ 
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 10/23/2014

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET

Michael A. Johnson,  IL Atty No. 51065
MICHAEL A. JOHNSON & ASSOCIATES
415 N. LaSalle, Suite 502
Chicago, IL 60654
Telephone:  (312)222-0660

Susan M. Coler, MN Atty No. 217621,
IL Atty No. 6201012
Clayton D. Halunen,  MN Atty No. 219721
HALUNEN & ASSOCIATES
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099

ATTORNEYS FOR PLAINTIFF/RELATOR

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
SUPPRESSED

## DEFENDANTS
SUPPRESSED

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Hennepin
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Attachment

Attorneys *(If Known)*

*FILED*

OCT 2 3 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*        *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | | |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | | |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | | |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | | |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

1:14-cv-08331
Judge Ruben Castillo
Magistrate Judge Daniel G. Martin

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
False Claims Act , 31 U.S.C. § 3729 et seq.

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
10/23/2014

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

# ATTACHMENT TO CIVIL COVER SHEET

Michael A. Johnson,  IL Atty No. 51065
MICHAEL A. JOHNSON & ASSOCIATES
415 N. LaSalle, Suite 502
Chicago, IL 60654
Telephone:  (312)222-0660


Susan M. Coler, MN Atty No. 217621,
IL Atty No. 6201012
Clayton D. Halunen,  MN Atty No. 219721
HALUNEN & ASSOCIATES
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099

ATTORNEYS FOR PLAINTIFF/RELATOR